IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 7, 2022 Session

**STATE OF TENNESSEE v. KEYSHAWN DEVONTE FOUSE**

**Appeal from the Circuit Court for Madison County**
**No. 20-37      Kyle C. Atkins, Judge**

_____

**No. W2021-00380-CCA-R3-CD**

_____

A Madison County jury convicted the defendant, Keyshawn Devonte Fouse, of attempted first-degree murder resulting in serious bodily injury, aggravated assault, and employing a firearm during the commission of a dangerous felony, for which he received an effective sentence of twenty-six years in confinement. On appeal, the defendant contends the evidence presented at trial was insufficient to support his conviction for attempted first-degree murder. The defendant also argues the trial court erred in allowing reference to the defendant's nickname, "Shoota," and in misapplying the law regarding presumptive sentences and sentencing factors. After reviewing the record and considering the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JILL BARTEE AYERS and JOHN W. CAMPBELL SR., JJ., joined.

Brian D. Wilson, Assistant Public Defender, Tennessee District Public Defenders Conference (on appeal) and Jeremy Epperson, District Public Defender, and John Hamilton, Assistant Public Defender (at trial), for the appellant, Keyshawn Devonte Fouse.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Brad Champine, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On August 26, 2019, the victim, Mario Wilson, was attending a party at the Omega Psi Phi fraternity house at Lane College in Jackson, Tennessee. The victim, a member of the fraternity, was assigned to "secure the [front door of the fraternity house] as much as possible." At approximately 10:00 p.m., the defendant, who the victim knew as "Shoota" and who had previously dated the victim's girlfriend, approached the victim and asked to speak with him. The defendant asked if the victim knew the defendant had been robbed, and the victim stated that he did not. The defendant then informed the victim that some women had told the defendant that the victim had robbed him, which the victim again denied. The defendant's demeanor was calm and non-threatening, and he did not brandish a weapon at this time. However, before the conversation could continue, the victim left to speak to other partygoers.

Just before midnight, the defendant again approached the victim at the front door of the fraternity house. He stated that "it wasn't sitting right with him . . . that he heard that [the victim] had robbed him." The defendant began walking away from the house, and the victim followed him, explaining that he had nothing to do with the robbery. When they reached a grassy area between two houses, the defendant turned around and said, "I just don't like that s**t." The defendant then placed a black handgun against the victim's chest and shot him twice. The victim fell to his knees and looked up to see the barrel of the gun pointed toward his head. He turned away, waiting for the defendant to kill him; however, after several seconds, the victim could hear the defendant fumbling with the gun saying, "S**t, the gun jammed." As the victim watched, the defendant ran across the street to a waiting vehicle where he continued fumbling with the gun. The victim could see people inside the vehicle but was unable to identify them. Realizing this was the only opportunity to save his life, the victim ran back to the fraternity house before collapsing in the driveway. As he lost consciousness, several of his fraternity brothers placed him in the back of a truck and drove him to the hospital. Upon waking up in the hospital, the victim spoke with the police and identified the defendant as the person who had shot him.

Officer Bradley Lewis with the Jackson Police Department ("JPD") responded to a shots fired call around midnight. Because the victim had already been transported to the hospital, Officer Lewis began searching for evidence using the report he received from ShotSpotter, a system that pinpoints the location of gunfire throughout the city. Based on the ShotSpotter report, which alerted Officer Lewis that two shots were fired and their approximate location, Officer Lewis was able to locate two .40 caliber shell casings in the grass south of the fraternity house, and on the sidewalk near the casings, Officer Lewis discovered a blood trail leading back to the driveway of the fraternity house.

Sergeant Adam Pinion with the JPD Major Crimes Unit was assigned to lead the investigation. After the defendant was identified by the victim as the perpetrator of the shooting, Sergeant Pinion obtained an arrest warrant that was executed at a residential

address on August 30, 2019. After taking the defendant into custody, Sergeant Pinion obtained consent from the residents of the house to conduct a search and recovered a white Samsung cell phone belonging to the defendant as well as a black and chrome .40 caliber Smith & Wesson pistol hidden in the tank of a toilet. Following his arrest, the defendant gave a statement in which he denied shooting the victim but admitted to being present at the fraternity party.

During the course of his investigation, Sergeant Pinion recovered recordings of the defendant's phone calls from jail. Three calls were played for the jury. During one of the calls the defendant identified himself as "Shoota." In another he stated, "They caught me with that burner," which Sergeant Pinion explained is a term which means a firearm. In the third call, the defendant stated, "They say they have some text messages of me telling on myself." Sergeant Pinion also recovered two of the defendant's jail visitation videos which were played for the jury. The first video contained footage of the defendant giving a woman directions to the toilet where the gun used in the shooting was found. In the second video, the defendant asked his friends to "[g]o to the toilet, stick [their] hand in the water," and get his money out.

Investigator Robert Groves with the JPD performed a physical extraction of the defendant's cell phone and recovered several text messages related to the shooting. The day after the shooting, the defendant sent a text message to Jamayka White, his girlfriend at the time, stating, "Lol I shot bruh[.] I tried to kill em but my gun jammed when I was standing ova him." Later that day, the defendant sent a text to a contact named Kiki stating, "Yeah my gun jammed when I was tryna kill em shit got me hot asf." Investigator Groves also recovered several Facebook messages from the defendant's phone. In one exchange, the defendant, whose Facebook handle was "Ymg Shoota," stated that he had a "[s]trap fa sale." Investigator Groves explained that a "strap" was street lingo for a firearm. When the person asked what type of gun the defendant had, he responded that it was a "Smith and Wesson chrome and black 40."

John Lewoczko, a firearms examiner with the JPD and an expert in firearms identification, analyzed the shell casings recovered from the crime scene and the firearm recovered from the residence where the defendant was arrested. Mr. Lewoczko opined that the two casings had been fired from the Smith & Wesson pistol that he examined.

The victim suffered extensive injuries as a result of the shooting. The bullets pierced his lung, which caused the victim to require a breathing tube in his chest for a month. Although doctors were able to remove one bullet when the victim arrived at the hospital, he had to return a month later to have the second bullet removed from his back. Additionally, the gunshot wounds resulted in a permanent scar on the victim's chest and caused him to experience extreme pain.

The defendant declined to present evidence. Following deliberations, the jury found the defendant guilty of attempted first-degree murder resulting in serious bodily injury (count one), aggravated assault (count two), and employing a firearm during the commission of a dangerous felony (count three). The trial court imposed a sentence of twenty years at 85% for count one, four years at 30% for count two, and six years at 100% for count three. The trial court merged count two into count one and ordered count three to be served consecutive to count one, for an effective sentence of twenty-six years.

Although the judgments of conviction were entered on January 5, 2021, the defendant did not file a motion for new trial until February 10, 2021, which was untimely, thereby waiving all issues except for sufficiency and sentencing. *See* Tenn. R. Crim. P. 33(b); *State v. Bough*, 152 S.W.3d 453, 460 (Tenn. 2004). The trial court denied the motion on April 1, 2021, and the defendant's notice of appeal was filed on April 13, 2021.

Because the defendant's late-filed motion for new trial did not toll the time for filing a notice of appeal, his notice of appeal was also untimely. *See* Tenn. R. App. P. 4(a). However, unlike the untimely filing of the motion for new trial, this Court does have the discretion to waive the untimely filing of a notice of appeal, and we choose to do so in this case. *See id.*

## *Analysis*

On appeal, the defendant contends that the evidence presented at trial was insufficient to support his conviction for attempted first-degree murder[1] and that the trial court erred in misapplying the law regarding presumptive sentences and sentencing factors. The defendant also requests plain error review of the trial court's admission of references to the defendant's nickname throughout the trial. The State contends the evidence is sufficient, the trial court properly imposed a within-range sentence, and the defendant is not entitled to plain error relief.

## I.     Sufficiency

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury

---

[1] The defendant does not challenge his convictions for aggravated assault or employing a firearm during the commission of a dangerous felony.

- 4 -

shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of one count of attempted first-degree murder resulting in serious bodily injury. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id.* § 39-12-101(a)(3). Relevant to this case, first-degree murder is the premeditated and intentional killing of another. Tenn. Code Ann. § 39-13-202(a)(1).

Premeditation is "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Tennessee Code Annotated section 39-13-202(d) further states:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully

considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id.* Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted).

Here, the defendant does not dispute that he shot the victim. Instead, the defendant argues the State failed to establish that he acted with premeditation. Specifically, the defendant concedes that he used a deadly weapon on an unarmed victim and, therefore, one *Bland* factor applies. However, he insists "this fact alone cannot support a finding of premeditation." The State contends there was ample evidence to support the jury's determination, and we agree.

In the light most favorable to the State, the evidence shows that the defendant lured the victim away from a fraternity party after accusing him of being involved in a prior robbery, which the victim denied. Once the defendant had the victim in an isolated area, the defendant shot the victim twice in the chest and attempted to shoot him in the head. However, when the gun jammed, the defendant ran to a getaway car, and the victim was able to escape. Following the shooting, the defendant sent several text messages in which he admitted to shooting the victim and also attempted to sell the gun used in the shooting on Facebook. Police officers located the gun hidden in a toilet tank in the house where the defendant was staying at the time of his arrest.

Looking specifically to the premeditation factors outlined by our supreme court, the record establishes the defendant lured the unarmed victim to a secluded area after confronting him earlier in the evening regarding an alleged robbery. The defendant shot the victim twice in the chest, causing him to fall to his knees. He then pointed the gun at

the victim's head and attempted to fire a third shot; however, the gun jammed. After the defendant's gun jammed, preventing him from delivering the fatal shot, he did not attempt to render aid to the victim, choosing instead to run to a getaway vehicle waiting across the street. While the defendant attempted to unjam his gun, the victim was able to run back to the fraternity house and alert his friends. Finally, following the shooting, the defendant attempted to dispose of the gun by selling it on Facebook and hid it in a toilet tank prior to his arrest. *See Bland*, 958 S.W.2d at 660; *Larkin* 443 S.W.3d 815-6. Accordingly, the record is sufficient to establish premeditation and intent so as to sustain a conviction for attempted first-degree murder.

The defendant also contends the victim did not suffer serious bodily injury as a result of the shooting. Specifically, the defendant argues that the victim had recovered from his wounds by the time of his trial and that the State failed to present evidence that the victim experienced protracted unconsciousness or extreme physical pain. The State contends the evidence is sufficient to support the jury's determination that the victim suffered serious bodily injury from the two gunshot wounds to his chest.

While serious bodily injury is not an element of attempted first-degree murder, when a victim of attempted first-degree murder suffers serious bodily injury as a result of the crime, a defendant is not eligible for release until he serves 85% of his sentence. Tenn. Code Ann. § 40-35-501(k)(5). "'Serious bodily injury' includes bodily injury that involves: (A) a substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; (E) protracted loss or substantial impairment of function of a bodily member, organ or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(37). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" *Id.* § 39-11-106(a)(3). The subjective nature of pain is a fact to be determined by the trier of fact. *State v. Eric A. Dedmon*, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 23, 2006), *no perm. app. filed*. Moreover, this Court has specifically held that a scar satisfies the requirement for "protracted or obvious disfigurement." *State v. Deonte Matthews*, No. M2010-00647-CCA-R3-CD, 2012 WL 5378046, at *4 (Tenn. Crim. App. Oct. 31, 2012), *no perm. app. filed*.

The victim testified that he suffered two gunshot wounds to his chest which caused him to experience extreme pain. The bullets pierced his lung, and he required a breathing tube in his chest for over a month. Although one of the bullets was removed the night of the shooting, the victim was forced to return to the hospital a month later to have the second one removed, and he suffered permanent scarring on his chest from the gunshot wounds. The victim's credibility and subjective nature of his pain were factual determinations for the jury, and we will not reevaluate them on appeal. Viewed in the light most favorable to

the State, the evidence is sufficient for a rational juror to conclude the victim suffered serious bodily injury, and the defendant is not entitled to relief on this issue.

## II.      Admissibility of the Defendant's Nickname – Plain Error

The defendant argues the trial court erred in allowing the use of his nickname, "Shoota," because it unfairly prejudiced the jury against him. The State contends that the issue has been waived due to the defendant's untimely motion for new trial and that plain error relief is not merited. The defendant filed a reply brief requesting plain error review.

Before an error may be recognized, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). In *State v. Smith*, our supreme court adopted *Adkisson*'s five-factor test for determining whether an error should be recognized as plain:

(a) The record must clearly establish what occurred in the trial court;

(b) A clear and unequivocal rule of law must have been breached;

(c) A substantial right of the accused must have been adversely affected;

(d) The accused did not waive the issue for tactical reasons; and

(e) Consideration of the error is "necessary to do substantial justice."

24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283.

The defendant contends the trial court erred in allowing his nickname, "Shoota," to be used multiple times throughout the trial, unfairly prejudicing the jury. The State submits the nickname was relevant to establish the defendant's identity and did not saturate the trial.

Prior to trial, a hearing was held during which the defendant sought to have his nickname, "Shoota," excluded on the basis that it was overly prejudicial. The State argued that several witnesses, including the victim, could only identify the defendant by his nickname and that the nickname was the only thing that could tie the defendant to several

pieces of evidence. The trial court found that the nickname was prejudicial "in a shooting case" but "that the probative value substantially outweigh[ed] the danger of unfair prejudice."

During the State's opening statement, the prosecutor stated that

[a]bout an hour later [the defendant], an individual [the victim] knew only by his nickname of "Shoota" came to the party. [The defendant] approached [the victim] and confronted him.

Through he knew him only as "Shoota," [the victim] also knew that he was currently dating a girl that [the defendant] had dated previously.

. . .

The Jackson Police Department began an investigation immediately, searching for this person known as "Shoota" that [the victim] positively identified to police officers as the person who tried to take his life.

During the victim's testimony, the following exchanges occurred:

PROSECUTOR: All right. And what name did you know him by?

VICTIM: "Shoota."

. . .

PROSECUTOR: All right. And did you identify the person in that photograph as "Shoota" or the person that you knew had shot you that evening?

VICTIM: Yes.

During Jamayka White's testimony, she was asked what nickname the defendant went by, and she replied, "Shoota." Sergeant Pinion testified that the defendant identified himself as "Shoota" in a jail call, and the call was played for the jury. The State later asked Sergeant Pinion if the defendant appeared "to be scared in the jail calls when he was referring to himself as 'Shoota.'" Investigator Groves testified that the defendant's Facebook handle was "YMG Shoota," and the defendant's Facebook messages were admitted into evidence.

During closing argument, the prosecutor made the following statement

> [The victim] identified positively the defendant, [] the person he knows as "Shoota," as the person who shot him.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is typically admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

This Court has stated that "[n]icknames should generally be avoided[]" during a trial and that "trial courts should closely monitor any misuse." *State v. Zirkle*, 910 S.W.2d 874, 886 (Tenn. Crim. App. 1995). In the present case, the State mentioned the defendant's nickname multiple times during its opening statement, and its first witness, the victim, testified that he knew the defendant as "Shoota." After the victim's testimony, the State elicited the defendant's nickname from three additional witnesses, admitted several pieces of incriminating evidence containing the nickname, and used it a final time during its closing argument.

We find the State's repeated use of the defendant's prejudicial nickname throughout the trial to be improper. *Compare State v. Joey Dewayne Thompson*, No. E2003-00569-CCA-R3-CD, 2004 WL 1592817, at *10 (Tenn. Crim. App. July 16, 2004) (holding the prosecutor's repeated use of the defendant's nickname "Joe Thug" during its questioning of four witnesses to prove identity was improper), *no perm. app. filed*, *with State v. Darron Rogers*, No. W2019-00545-CCA-R3-CD, 2020 WL 3482131, at *2 (Tenn. Crim. App. June 24, 2020) (finding the trial court did not err in allowing the nickname "Weed" where it went to establishing identity and was used by one witness), *no perm. app. filed*. However, because the defendant has failed to show that the error affirmatively affected the result of the trial, any error was harmless. Tenn. R. App. P. 36(b). Based on our review of the record, we do not believe the prosecution "saturated" the trial with the defendant's nickname to the extent the record affirmatively shows that it affected the jury's verdict. *See Joey Dewayne Thompson*, 2004 WL 1592817, at *10. Moreover, the evidence of the defendant's guilt is overwhelming. The victim testified that the defendant lured him to a secluded area and shot him twice in the chest before his gun jammed. Shell casings found at the scene matched the gun found at the house where the defendant was arrested. The defendant's incriminating texts, Facebook messages, jail calls, and jail visitation videos

linked him to the shooting and established that he was the perpetrator. Accordingly, we conclude any error on the part of the trial court in admitting the defendant's nickname was harmless.

As we have determined the error was harmless, consideration of the error is not necessary to do substantial justice. Because we are reviewing the issue for plain error, the defendant "bears the burden of persuading the appellate court . . . that the error was of sufficient magnitude that it probably changed the outcome of the trial." *State v. Martin*, 505 S.W.3d 492, 505 (Tenn. 2016). The defendant has failed to do so, and therefore, is not entitled to plain error relief.

## III. Sentencing

The defendant challenges several of the trial court's decisions regarding the length of his sentence. He asserts the trial court misapplied the law regarding presumptive sentences. He further argues the trial court misapplied enhancement factors (1), (5), and (10) and failed to consider his youth as a mitigating factor. The State contends the trial court properly sentenced the defendant to a within-range sentence.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, -210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id.* § 40-35-210(e).

When an accused challenges the length and manner of service of a sentence, this Court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancement or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

## A.     Presumptive Sentence

The defendant argues the trial court misapplied the law when it relied on outdated case law regarding presumptive sentences. Specifically, the defendant argues the State provided the trial court incorrect case law which caused the trial court to believe the defendant's presumptive sentence was in the middle of the range for his attempted first-degree murder conviction. The State contends the trial court properly sentenced the defendant to a within-range sentence.

At the sentencing hearing, the State argued that "[u]nder *State v. Chance*[2] . . . the presumptive sentence for a Class A felony is the middle of the range." In sentencing the defendant, the trial court found that

> [t]he defendant was convicted of a Class A felony, attempt to commit first[-]degree murder. That is an 85 percent sentence regardless of what the sentence is. The range is 15 years to 25 years. The presumptive sentence is the middle on that at 20 years.
>
> Although the [c]ourt is not bound by the presumptive sentence, I did make specific findings of enhancement factors. So I am going to go with [the] midrange, 20 years at 85 percent.

As noted above, the 2005 amendments to the Sentencing Act abandoned presumptive sentences. *See* Tenn. Code Ann. § 40-35-114. While it is clear the trial court misstated the law regarding the presumptive sentence in this case, it also noted that it was

---

[2] 952 S.W.2d 848 (Tenn. Crim. App. 1997).

"not bound by the presumptive sentence." The trial court explained its consideration of several enhancement factors and stated that it believed the within-range sentence imposed was consistent with the purposes and principles of the Sentencing Act. Therefore, despite its misstatement, we find the record supports the trial court's imposition of twenty years for the defendant's conviction of attempted first-degree murder. *See Bise*, 380 S.W.3d at 707.

## B. Enhancement and Mitigating Factors

The defendant argues the trial court misapplied enhancement factors (1), (5), and (10). Specifically, the defendant contends the trial court improperly relied on his expulsion from college for possessing a handgun on campus for factor (1), failed to show the defendant acted with particular cruelty in a way that was not part of the offense for factor (5), and applied factor (10) without determining the defendant created a risk to human life other than the victim. The defendant also argues the trial court failed to consider his youth as a mitigating factor. The State concedes the trial court erred in applying enhancement factor (10) but contends it properly weighed the remaining factors and exercised its discretion in finding that mitigating factor (6) did not apply.

Here, the trial court applied enhancement factors (1) the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (5) the defendant treated the victim with exceptional cruelty during the commission of the offense; (9) the defendant possessed or employed a firearm during the commission of the offense; and (10) the defendant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(1), (5), (9), (10). The trial court specified that enhancement factor (9) only applied to the defendant's conviction for attempted first-degree murder.[3]

In considering enhancement factor (1), the trial court noted

> It's really not criminal convictions. He only has one criminal conviction. But he had admitted drug use. But more specifically, he got dismissed from Lane College on a weapons charge. That troubles the [c]ourt. Guns these days are a troubling factor in our society.

Although the defendant takes issue with the trial court's usage of the phrase "weapons charge" because he had not been arrested or charged with a crime, as the State notes in its brief, at the time the defendant was expelled from Lane College in 2019, it was a crime to possess a firearm in a school building or on a school campus. Tenn. Code Ann.

---

[3] The defendant does not challenge the application of enhancement factor (9).

§ 39-17-1309 (2019). Additionally, the presentence report shows the defendant had a prior misdemeanor conviction and admitted to the underage use of alcohol and daily use of marijuana. It is clear the defendant had a prior criminal conviction at the time of sentencing and admitted criminal behavior sufficient for the trial court to apply enhancement factor (1).

The trial court also applied enhancement factor (5), finding that

> [t]he defendant came to this fraternity party twice that night. Both times he was there to confront the victim in this case.
>
> The second time he came he got the victim outside the house, shot him twice, and then stood over him to execute him but the gun jammed. This is verified by the text messages he sent to Ms. White, along with Ms. White's testimony, that he was there to kill the victim but the gun jammed.

The defendant contends that, while there was a brief period of time where he held the gun to the victim's head, it was because the weapon malfunctioned and not to prolong the victim's suffering and that "any harm inflicted upon [the victim] was not meant to invoke any particular cruelty for [the defendant's] gratification." Evidence supporting the application of the exceptional cruelty enhancement factor requires a finding of cruelty "over and above" what is required for the offense itself. *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001) (quoting *State v. Embry*, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995)). "'Exceptional cruelty' when used as an enhancement factor, denotes the infliction of pain and suffering for its own sake or from gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." *State v. Reid*, 91 S.W.3d 247, 311 (Tenn. 2002). Although this factor is most often used in cases of abuse or torture, it has been found applicable in cases where traumatic and severe injuries were sustained by the victim. *State v. Gray*, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997). When applying this factor, a trial court should articulate which actions of the defendant, apart from the elements of the offense, constitute exceptional cruelty. *State v. Goodwin*, 909 S.W.2d 35, 45-46 (Tenn. Crim. App. 1995). Here, after shooting the victim twice in the chest, the defendant stood over him and held the gun to his head for several seconds before saying, "S**t, the gun jammed." Although we have no doubt the victim experienced fear during those seconds while waiting for the last shot, we cannot say that the defendant's actions rose to the level of being "exceptionally cruel" so as to warrant application of enhancement factor (5). *See State v. Tavarus Williams*, No. W2000-03114-CCA-R3-CD, 2002 WL 818258, at *11 (Tenn. Crim. App. Apr. 17, 2002) (concluding enhancement factor (5) did not apply when the defendant shot the victim multiple times in rapid succession, while walking around the victim, "as if to pick spots from which to shoot"), *no perm. app. filed*.

In applying enhancement factor (10), the trial court found

> Not only was the risk high to human life, but it was the defendant's intent to take a human life but for the fact that the gun jammed.

As the State notes, enhancement factor (10), requiring a finding that the defendant had no hesitation about committing an offense involving a high risk to human life, "is applicable only when there is proof that the defendant's conduct in committing the offense created a high risk to the life of someone other than the victim." *State v. Trent*, 533 S.W.3d 282, 294 (Tenn. 2017). Accordingly, the trial court erred in applying this factor.

The defendant also contends the trial court erred in failing to consider his youth as a mitigating factor, resulting in an excessive sentence. When discussing the defendant's youth, the trial court noted that

> [t]he defendant [is] 20 years old. The victim, I think, was close to 20 years old. They both at one point were college students. And maybe if this had been a crime of passion or a crime that was spontaneous, I could find that.

> But in this case, the defendant confronted the victim twice, left the first time, came back after sufficient time to reflect on what his actions might entail.

> There was testimony that he made fair grades in high school, that he graduated high school and went to college. So I just can't make a finding that he lacked substantial judgment based on his age.

It is clear the trial court specifically considered the defendant's youth and chose not to give it any weight in mitigation. "A trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). Accordingly, we are precluded from reweighing appropriately applied enhancement and mitigating factors. *See id.* at 344-45. We find no error in the trial court's refusal to apply the requested mitigating factor.

Although the trial court misapplied enhancement factors (5) and (10), the "misapplication of an enhancement factor or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act." *Bise*, 380 S.W.3d at 706. In this case, enhancement factors (1) and (9) were applicable to the defendant's sentence. With the exception of the trial court's misstatement of the law

regarding presumptive sentences, as discussed further *supra*, our review of the record indicates the trial court imposed applicable within-range sentences after properly considering the evidence adduced at trial and the sentencing hearing, the presentence report, the principles of sentencing, the parties' arguments, the nature and characteristics of the crime, the potential for rehabilitation, and the evidence of enhancement and mitigating factors. Tenn. Code Ann. §§ 40-35-103(5), -114, -210(b). The defendant is not entitled to relief on this issue.

### *Conclusion*

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
J. ROSS DYER, JUDGE